1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RANDOLPH BROWN,

11           Plaintiff,                    No. CIV 2:11-cv-2848-JFM

12        vs.

13   L-1 SECURE CREDENTIALING,
     INC., *et al.*,
14

15           Defendants.           <u>ORDER</u>

     _____/
16

17           On October 25, 2012, the court held a hearing on defendants L-1 Identity

18   Solutions, Inc. and L-1 Secure Credentialing Incorporated's (collectively, "defendants" or "L-1")

19   September 7, 2012 motion for summary judgment.[1]  Martin Jennings, Jr., appeared on behalf of

20   plaintiff.  Kristin Oliveira appeared on behalf of L-1.  On review of the motion, the documents

21   filed in support and opposition, after hearing the arguments of counsel, and good cause

     appearing therefor, THE COURT FINDS AS FOLLOWS:
22
     /////
23
     /////
24

25   _____

26        [1] This matter is proceeding before the undersigned based on the consent of the parties.
     <u>See</u> Doc. No. 13.

                                          1

FACTS[1]

A.    Background

          L-1 is an identity management solutions provider, creating personal identification documents such as driver's licenses and identification cards pursuant to contracts with state and federal governmental agencies.  Hamel Decl. ¶ 5.

          In 2008, L-1 acquired Digimarc Corp. ("Digimarc"), which operated a manufacturing facility in Sacramento, CA (known as the "Del Paso Plant").  Hamel Decl. ¶ 4. At the time of this acquisition, plaintiff Randall Brown ("plaintiff" or "Brown"), born May 26, 1949, was a salaried factory manager at the Del Paso Plant, having been hired in October 2006.[2] See Brown Decl. ¶¶ 1-2; Brown Dep. at 40:12-13; Pennetta Decl. ¶ 4.  Prior to joining Digimarc as a factory manager, Brown had only two years of management experience gained between approximately 1982 and 1984.  See Brown Dep. at 46:24–47:16.  Brown understood that, as a production manager, the production process was ultimately his responsibility.  Id. at 72:12-15.

          Brown was the highest level employee at the Del Paso Plant where he oversaw a staff of seven employees and was responsible for the manufacturing of driver's licenses and identification cards for California and Michigan.  Brown Dep. at 57:22-25, 70:25–71:2; Pennetta Decl. ¶¶ 4-5.  The manufacturing process at the Del Paso Plant was well-established and routine, with only five discrete manufacturing steps.  Pennetta Decl. ¶ 6.

          While at the Del Paso Plant, plaintiff received a positive performance evaluation for the period of August 29, 2006 through December 31, 2006.  See Brown Decl. ¶ 5, Ex. 1. Brown also received a satisfactory performance evaluation for the period of January 1, 2009 through December 31, 2009.  Id. ¶ 6, Ex. 2.

----

[1]  All facts are undisputed unless noted otherwise.

[2]  In his deposition, Brown testified that he started working for Digimarc in October 2006.  See Brown Dep. at 40:12-13.  In his declaration, however, plaintiff declares that he began his employ in August 2006.  See August 2006.  The actual start date is immaterial to the resolution of L-1's motion for summary judgment.

On March 2, 2010, Brown received a letter from Leo Sullivan, President of L-1, for his "commitment and dedication during a very challenging 2009." Brown Decl. ¶ 8, Ex. 4.

On July 1, 2010, Brown received a salary increase. Brown Decl. ¶ 7, Ex. 3.

In 2010, Brown assisted Dennis Kallelis, L-1's Chief Security Officer, on attaining NASPO[3] certification, which was required for the DMV Contract. See Brown Decl. ¶ 10, Ex. 5; Pennetta Supp. Decl. ¶ 7. On September 22, 2010, plaintiff and others received an email of thanks for their work on the NASPO certification. Brown Decl. ¶ 10, Ex. 5; Pennetta Supp. Decl. ¶ 7. This work culminated in receipt of a NASPO Level 2 Certification Award, which Brown accepted in November 2010 in Colorado. Brown Decl. ¶ 10. Brown went to Colorado to receive the award pursuant to L-1's policy of inviting factory managers to accept the NASPO certifications for their facilities. Pennetta Supp. Decl. ¶ 8.

B.   The DMV Contract

In 2009, L-1 entered into a contract with the California Department of Motor Vehicles ("DMV") valued at over $100 million ("the DMV Contract") to produce driver's licenses and identification cards with new security features. Hamel Decl. ¶¶ 6-8. Because the provision of the new security features required a new and more complex manufacturing process, L-1 began working on a new production facility at the former McClellan Air Force Base ("the McClellan Plant") in Sacramento, California. Id. ¶ 9. Under this new manufacturing process, there were 13 discrete manufacturing steps, including at least two separate inspections before a final card was ready for delivery to the DMV. Pennetta Decl. ¶ 10.

In February 2010, about seven months before the McClellan Plant was scheduled to open, Senior Director of Manufacturing David Pennetta became Brown's direct supervisor. Pennetta Decl. ¶¶ 1, 3. Working out of Indiana, Pennetta supervises production managers at L-1's nine plants across the country. Id. ¶ 3. Pennetta reports to Jeffrey Hamel, L-1's Vice

---

[3]  "NASPO" stands for the North American Security Productions Organization. Pennetta Supp. Decl. ¶ 7.

1    President of Program Management.  Id. ¶ 2; Hamel Decl. ¶ 1.  Hamel reports to Division

2    Executive Vice President Bob Eckel.  Hamel Decl. ¶ 3.  Hamel and Eckel work out of

3    Massachusetts.  Id.

4           In May 2010, Pennetta traveled to Sacramento to begin planning for the opening

5    of the McClellan Plant.  Pennetta Decl. ¶ 7.  The agenda for this visit was to review staffing and

6    training plan details with Brown to ensure that both the Del Paso Plant and the new McClellan

7    Plant could be operated each day during the startup of the new factory.  Id.

8           In mid-2010, L-1's engineers and vendors visited the McClellan Plant to set up

9    the equipment.  Pennetta Decl. ¶ 11.  Tim Arthur, a production control specialist in Sacramento

10   who reported to Brown, helped the engineers set up the new equipment and then learned how to

11   operate each machine.  Id.  Arthur was under the age of forty at all times relevant to this action.

12          In May or June 2010, Hamel visited the McClellan Plant.  Hamel Decl. ¶ 10.  At

13   the time, numerous support personnel from L-1's Fort Wayne, Indiana facility were working with

14   the plant operators to train them on the new equipment and get the factory ready for the start of

15   production.  Id.  While there, Hamel noticed that Brown was not around often.  Id.  Hamel also

16   learned from numerous support personnel that Brown was regularly absent and not spending

17   time learning the new processes or equipment.  Id.  Hamel expressed these concerns to Pennetta.

18   Id.  Brown was aware that Hamel was displeased with his absence from the plant on at least one

19   occasion.  Brown Dep. at 136:25–137:17.

20   C.     The McClellan Plant Opens and Faces Production Problems

21          In late September 2010, the McClellan Plant opened and began working on the

22   DMV Contract.  Hamel Decl. ¶ 11; Pennetta Decl. ¶ 12.  Immediately after opening and

23   continuing to the beginning of 2011, the DMV rejected thousands of cards that did not meet its

24   quality expectations.  Pennetta Decl. ¶ 13.  Some errors were cosmetic, but others were

25   considered "fatal" – i.e., they had mismatched photos and names, and incorrect or missing

26   ultraviolet data.  Id.  Many of the defects were the result of software and engineering errors in

4

the manufacturing process.  Id. ¶ 12.  The DMV would add the rejected cards into the next production job sent to the McClellan Plant, resulting in a backlog of cards to be produced.  Id. ¶ 13.

The McClellan Plant, if operating to schedule, had the capacity to manufacture approximately 150,000 cards during a five-day week.  Hamel Decl. ¶ 17.  At one point in the Fall of 2010, the backlog of rejected cards grew to roughly 900,000 cards waiting to be made or reprinted.  Id.  To make progress on this backlog, overtime was authorized for an operation that would run 24 hours a day, 7 days a week.  Id.  This would allow the factory to make an additional 60,000-75,000 cards per week.  Id.  Under this new schedule, it was projected that L-1 would take nine weeks to recover from the production backlog.  Id.

During this time, Pennetta began visiting the McClellan plant every four weeks, spending the majority of a week each time there.  Pennetta Decl. ¶ 15; Brown Dep. at 128:18-23.  Hamel also visited the McClellan Plant on a number of occasions in September, October, November, and December 2010.  Hamel Decl. ¶ 13.  While at the plant, Pennetta would "essentially take over as manager" directing the production of the cards and the operation of the machinery.  Brown Dep. 129:1-4.  Although Pennetta was reluctant to step on Brown's toes while there, he took an active role managing the McClellan Plant because he felt "that Brown was unwilling, unavailable, or unable to direct the staff."  Pennetta Decl. ¶ 26.

In October 2010, the Deputy Director for Driver Services for the DMV, as well as the Program Manager at the DMV, spoke with Hamel and Eckel on a weekly basis to receive an update on the backlog.  Hamel Decl. ¶ 14.  Hamel, in turn, was speaking to the DMV Director on an almost daily basis to provide updates on L-1's progress.  Id.

The DMV became increasingly dissatisfied with L-1.  It complained to Hamel about the management of the McClellan Plant and expressed unhappiness with the poor quality and quantity of the cards being delivered.  Hamel Decl. ¶ 15.  Hamel told Pennetta that the DMV believed Brown was not the right factory manager for the new production.  Pennetta Decl. ¶ 23.

1  The DMV also refused to make payments to L-1 for over six months after payment was due

2  under the DMV Contract and did not make any payments until the backlog was fully eliminated

3  in Spring 2011.  Hamel Decl. ¶ 19.  Additionally, because L-1 was providing defective cards at a

4  greater rate than expected, the DMV increased its own inspections of the deliveries and charged

5  L-1 a sizeable sum of money for the additional labor expense incurred as a result of those

6  inspections.  Hamel Decl. ¶ 18.

7         By mid to late October 2010, significant progress had not been made in

8  eliminating the backlog of unmade cards for the DMV.  Pennetta Decl. ¶¶ 20-21.  In light of this,

9  Pennetta told Brown that he needed to work the overnight shift until they made progress on

10 catching up on the completed jobs.  Id.  He also directed Brown to work specific hours because

11 of repeated reports that Pennetta had received that the staff needed questions answered and could

12 not find Brown.  Id.  Pennetta told Brown that it was critical that he be at the McClellan Plant to

13 oversee the inspection process, participating in inspections himself if necessary, to ensure that

14 fatal defects were caught before the cards left the factory.  Id.

15        By late October 2010, Pennetta became concerned that Brown was not doing

16 enough to assist the team in working down the production backlog or guiding the operators on

17 needed inspections to contain defects within the factory so that they would not be delivered to

18 the DMV.  Pennetta Decl. ¶ 22.  While visiting the plant, Pennetta observed that Brown was

19 often not physically on the factory floor and would sometimes be out of the facility during his

20 work shift.  Id. ¶ 24.  Often, Pennetta needed to speak to Brown but could not find him.  Id.

21 D.    The October 26, 2010 Email

22        On October 26, 2010, Pennetta sent Brown an email itemizing his precise

23 expectations of him ("the October 26, 2010 email").  Pennetta Decl. ¶ 16, Ex. A.  Per this email,

24 Brown was directed to provide daily status reports as well as reports of any equipment issues.

25 Id.  One of the reasons that Pennetta wrote this email was because he was not consistently

26 receiving the information he needed from Brown to understand the production errors and help

1  the team resolve the issues.  Id. ¶ 16.  Pennetta was displeased because he often had to chase

2  down status updates from Brown, receiving them late or not at all.  Id. ¶18.  See also Brown Dep.

3  197:7-25.

4         The October 26, 2010 email also directed Brown to be at the plant "excessively to

5  support what your team needs to be successful.  Ask what they need to get the job done – they

6  will tell you how you can help or support they need."  Pennetta Decl., Ex. A.  Pennetta told

7  Brown to be at the plant "excessively" because he perceived that Brown was not consistently

8  available at the plant to provide support or answer the questions of factory staff or the engineers

9  who were working on the equipment.  Id. ¶ 19.  Brown was aware of "[h]alf a dozen" instances

10 when people were looking for him at the McClellan Plant but could not find him.  Brown Dep. at

11 120:19–121:4.  Brown explains these absences on his need to split his time between the

12 McClellan Plant and the Del Paso Plant.  Id.  He was aware that on two separate occasions,

13 management, including Pennetta, expressed concern about Brown's absences from the

14 McClellan Plant.  Id. at 127:12-14, 136:25–137:17.

15        Pennetta was disappointed to have to prepare the October 26, 2010 email because

16 he believed that Brown, due to his management background, should have already known how to

17 take steps to help the team complete card production jobs as efficiently as possible.  Pennetta

18 ¶ 16.

19        During the week of November 8, 2010, Brown was in Colorado to receive the

20 NASPO certification award.  See Brown Decl., Ex. 6.  On November 9, 2010, Pennetta sent

21 Brown an email directing him to switch his working hours upon his return from Colorado to 5:00

22 p.m. to 5:00 a.m. in order to assist the night shift team to maximize output and facilitate

23 completion of the backlogs so that L-1 can make the 7:00 a.m. delivery every day.  Id.  Brown

24 viewed Pennetta's directive as "micro-management."  See id.

25        By mid-November 2010, Pennetta was still not receiving daily status reports

26 seven days a week, as requested in the October 26, 2010 email.  Pennetta Decl. ¶ 27.  Brown

1  testified that Pennetta was "obsessive" about receiving these status updates at 6:00 a.m. and 6:00

2  p.m., but did admit that sometimes he was so busy that he would send the status updates late or

3  not at all.  Brown Dep. at 197:11-12.  On more than one occasion, Pennetta expressed

4  displeasure and dissatisfaction to Brown regarding receipt of the status updates.  Id. at 197:20-

5  25.

6         When Pennetta did not receive daily status updates or when he could not locate

7  Brown by calling the plant, he began regularly turning to Arthur, whom Pennetta saw as "always

8  responsive and available at the plant."  Penneta Decl. ¶ 18.

9  E.     The Performance Improvement Plan

10        In or about November 2010, Hamel felt that Brown was ineffective in his

11 management of the McClellan Plant and spoke to Eckel about terminating him.  Hamel Decl.

12 ¶ 15.  Eckel supported the decision because the McClellan Plant was substantially behind in its

13 production for the DMV and Brown was not taking sufficient steps to help Pennetta and the

14 factory team to identify the defects and reduce the backlog.  Id.  Ultimately, though, Hamel and

15 Pennetta decided to place Brown on a Performance Improvement Plan ("PIP").  Id. ¶ 16.

16        The PIP was prepared because of L-1's belief that the quality issues affecting the

17 DMV Contract should not arise if the team has appropriate leadership guidance and smooth

18 coordination between shifts.  See Pennetta Decl., Ex. B.  There were also concerns expressed by

19 an executive team who had recently visited the plant that Brown did not appear to be committed

20 to resolve the production issues.  Id.  This executive team saw a number of employees working

21 diligently on overtime, but noticed that Brown had left the facility with no explanation.  Id.

22 Additionally, on November 19, 2012, L-1 received information from Brown's employees raising

23 concerns about Brown's leadership and his frequent absences from the factory at critical times.

24 Id.  In the PIP, and in response to all of these factors, Pennetta directed Brown to be at the plant

25 from 8:00 a.m. to 8:00 p.m. until the quality issues and backlog were fully resolved.  Id.

26 /////

The PIP also directed Brown to (1) achieve a 99% DMV acceptance rate immediately; (2) enhance production quality checks on printed sheets; (3) document customer reject rates by defect type; (4) enhance 100% card level inspection after cutting; (5) reduce backlog by delivering 8 jobs per week; and (6) maintain production hours schedule for staff and visitors.

The PIP ended with the following:

> If you fail to meet these goals, you will be subject to disciplinary action up to and including termination of employment.  We will meet in two weeks to evaluate the situation and progress on this plan.  Do not lose site of the fact that this program is critical to the division's success and our customer's satisfaction.
>
> Randolph, I do not take this action lightly.  We have had several conversations and exchanges about these and other issues over the past month or two. We can not continue on this path.
>
> If, after reviewing the expectations of the position, you feel you are not able to do all that is needed to meet those goals, please let me know. You should seriously consider the expectation and your ability to meet them.

Pennetta Decl., Ex. B.

Pennetta did not hold Brown responsible for software or engineering errors in the manufacturing process either in the PIP or at any other time.  Pennetta Decl. ¶ 31.  Rather, he held him accountable for ensuring inspections were performed at the plant to catch defects before the delivery of the cards to the DMV.  Id.  He also held Brown responsible for the communication of rejection rates and defect types.  Id.  Finally, Pennetta expected Brown to keep him informed of the status of deliveries, information necessary so that Pennetta could determine if L-1 was making progress in reducing backlog.  Id.

On November 22, 2010, Human Resources Manager J. Kumfer met with Brown at the McClellan Plant to give him a copy of the PIP.  Kumfer Decl. ¶ 4.  Within a couple of days of his receipt of the PIP, Brown participated in a conference with Kumfer and Pennetta.  Id.; Brown Dep. at 166:13-25.

/////

1    Brown signed the PIP on November 24, 2010.  See Pennetta Decl., Ex. B.  He

2    understood that the PIP included requirements or requests that were being made of him to

3    achieve his job duties.  Brown Dep. at 166:7-10.  Brown testified that it was a reasonable

4    expectation to document customer reject rates by defect type.  Id. at 176:12-15.  He also testified

5    that he understood Pennetta to be very concerned about the issues set forth in the PIP.  Id. at

6    217:9-17.

7    While Kumfer was in Sacramento in November 2010, he interviewed five or six

8    machine operators at the McClellan Plant who reported to Brown to gauge employee morale.

9    Kumfer Decl. ¶ 6.  Some of these operators expressed frustration and unhappiness because they

10   were working at least 12-hour days, but did not see Brown working on the floor for more than 8

11   hours in a workday.  Id.  Kumfer shared this information with Pennetta.  Id.; Pennetta Decl. ¶ 36.

12   During the week of December 6, 2010, Pennetta again traveled to Sacramento to

13   assist with quality control.  Pennetta Decl. ¶ 37.  While there, Pennetta re-emphasized to Brown

14   that he needed to document the rejection rates of the licenses and cards, in compliance with the

15   PIP.  Id.

16   On December 10, 2010, Pennetta learned that Brown had not told his staff which

17   deliveries to make to the DMV, resulting in completed jobs left sitting in the plant for hours

18   while Brown's staff waited for direction.  Pennetta Decl. ¶ 40.  Pennetta viewed this lack of

19   guidance as yet another example of Brown's failure to communicate with and manage his staff.

20   Id.

21   F.    Brown's Termination

22   In November and December 2010 and January 2011, Pennetta spoke nearly every

23   day about the status of the McClellan Plant production and Brown's performance with Hamel.

24   Pennetta Decl. ¶ 39.

25   /////

26   /////

1      In or about mid-January 2011, Hamel and Pennetta decided to terminate Brown

2  because of their continued dissatisfaction with Brown's lack of progress in meeting the PIP

3  directives.  Pennetta Decl. ¶ 41.

4      Hamel approved the decision to terminate Brown upon concluding that Brown's

5  job performance had not improved since receiving the PIP.  Hamel Decl. ¶ 18.  Hamel believed

6  that, had Brown and his team implemented a staffing plan and improved the inspection process,

7  they would have been able to catch defective licenses and identification cards before the delivery

8  of completed jobs to the DMV and recover the backlog sooner.  Id.

9      On January 17, 2011, Brown was terminated during a meeting with Pennetta and

10  Vice President of Human Resources, Karen Budreau.  Pennetta Decl. ¶¶ 45-46, Ex. C.

11      Pennetta cites to three specific reasons for Brown's termination.  See Pennetta

12  Decl. ¶¶ 42-44, Ex. C.  First, the factory continued to deliver too many defective cards to the

13  DMV, and Brown had not eliminated or reduced the fatal error rates in delivered cards by

14  conducting or managing proper inspections at the McClellan Plant.  Pennetta expected Brown

15  and those who reported to him to inspect the cards in order to catch and contain defective cards

16  to the plant, rather than delivering defective cards to the DMV and having the DMV return the

17  defective cards in the next production job to be remade.  Pennetta declares that, had the defects

18  been contained to the plant, the reject rate would have been lowered and L-1 would have been

19  able to better control the backlog since the team could act more quickly in reprinting the cards if

20  necessary.

21      Second, Brown had been directed to document the rates and different reasons for

22  which the DMV was rejecting the cards produced by L-1.  Pennetta Decl. ¶ 43.  This would have

23  allowed L-1 to track its progress in containing and remedying defects in the production process.

24  Pennetta was dissatisfied with Brown's documentation, and Pennetta was forced to manually

25  evaluate the data for the DMV.  Pennetta expected Brown to reduce the reject rate to 1%.  If

26  Brown was unable to do that, then Pennetta expected Brown to chart the reasons for the defects

1  and the DMV's rejections of the cards.  Brown did not consistently provide this information to

2  Pennetta following the PIP.

3          Lastly, since his placement on the PIP, Brown had not been providing Pennetta

4  charts with data showing the deliveries of completed jobs and notification of production delays.

5  Pennetta Decl. ¶ 44.  Without this information, Pennetta was unable to regularly inform the

6  DMV and his superiors about potential delays.  As a result, the DMV was continuing to contact

7  L-1 to ask when they would receive deliveries, which embarrassed L-1.

8          Brown asserts that the reason Pennetta gave him for the termination was that,

9  even though Brown's performance and that of his team was excellent at the Del Paso Plant,

10  Pennetta felt that Brown was unable to adapt to the new, more complicated production process.

11  Brown Decl. ¶ 3.

12  G.    The Hiring of Brown's Replacement, Tim Arthur

13          Pennetta was responsible for hiring a new factory manager for the McClellan

14  Plant.  Pennetta Decl. ¶ 51.  Pennetta utilized the services of at least one professional recruiter to

15  search for a replacement.  Id

16          Tim Arthur was asked to temporarily manage the McClellan Plant while Pennetta

17  searched for a replacement for Brown.  Pennetta Decl. ¶ 52.  By April 2011, under Arthur's

18  leadership, L-1 had eliminated the backlog of cards.  Id. ¶ 62.

19          Arthur submitted his resume for the factory manager position.  Pennetta Decl.

20  ¶ 57.  Pennetta interviewed six candidates to replace Brown, in addition to Arthur.  Id.  Of the

21  candidates, Pennetta concluded that some were overqualified and thus would likely become

22  restless managing the McClellan Plant.  Id. ¶ 58.  There were thus two other candidates and

23  Arthur from whom Pennetta was left to choose.  Id.

24          Pennetta's impression of Arthur was that he was "hardworking and enthusiastic."

25  Pennetta Decl. ¶ 53.  This impression was based on the following: (1) Arthur worked more than

26  12 hours a day without complaint as L-1 was trying to remedy the backlog; (2) Arthur helped the

1   engineers set up the equipment at the McClellan Plant and learned from the engineers how to

2   operate the new equipment; (3) Arthur helped train the rest of the factory staff on the new

3   equipment and answered the team's questions as the new production began; and (4) when

4   Pennetta was visiting McClellan, Arthur was accessible and present on the floor helping with

5   quality control and operations.

6          Pennetta recommended Arthur for the position because he had become impressed

7   with Arthur's ability to manage the production, as well as his initiate and creativity.  Pennetta

8   Decl. ¶ 59.  While Arthur did not have significant experience managing individuals, a project

9   manager based at the McClellan Plant agreed to mentor Arthur.  Id. ¶ 60.

10          Under the DMV Contract, it was required that the DMV approve the factory

11   manager position.  Pennetta Decl. ¶ 61.  The DMV reviewed Arthur's resume and approved him

12   working as the McClellan Plant factory manager.  Id.

13          On July 1, 2011, Arthur was promoted to the factory manager position at the

14   McClellan Plant.  Pennetta Decl. ¶ 63.

15                          RELEVANT PROCEDURAL BACKGROUND

16          Plaintiff initiated this action on August 5, 2011 in the Sacramento County

17   Superior Court.  Defendants removed the case to this court on October 27, 2011 pursuant to 28

18   U.S.C. § 1332.  This matter is proceeding before the undersigned based on the consent of the

19   parties.

20          Plaintiff brings this action on the grounds that L-1 terminated him because of his

21   age, and that L-1 failed to pay him overtime wages in accordance with company policy and

22   procedure.  On September 7, 2012, L-1 filed the instant motion for summary judgment.  Plaintiff

23   opposes the motion.

24          This matter is set for a bench trial on December 10, 2012 before the undersigned.

25   A pretrial conference is scheduled for November 15, 2012.

26   /////

STANDARDS

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  A shifting burden of proof governs motions for summary judgment under Rule 56.  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56©).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  In re Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary judgment, the opposing party must demonstrate the existence of a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores

---

[4]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

1   Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such

2   that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v.

3   Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248).   A

4   party opposing summary judgment must support the assertion that a genuine dispute of material

5   fact exists by:  "(A) citing to particular parts of materials in the record, including depositions,

6   documents, electronically stored information, affidavits or declarations, stipulations . . . ,

7   admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

8   not establish the absence or presence of a genuine dispute, or that an adverse party cannot

9   produce admissible evidence to support the fact."[5]  Fed. R. Civ. P. 56(c)(1)(A)-(B).   However,

10  the opposing party "must show more than the mere existence of a scintilla of evidence."  In re

11  Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

12          In resolving a summary judgment motion, the evidence of the opposing party is to

13  be believed.  See Anderson, 477 U.S. at 255.  Moreover, all reasonable inferences that may be

14  drawn from the facts placed before the court must be viewed in a light most favorable to the

15  opposing party.  See Matsushita, 475 U.S. at 587; In re Oracle Corp. Sec. Litig., 627 F.3d at 387.

16  However, to demonstrate a genuine factual dispute, the opposing party "must do more than

17  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

18  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

20                          DISCUSSION

21  A.      Plaintiff's age discrimination claim fails

22          Plaintiff first asserts that defendants discriminated against him on the basis of his

23  age when they fired him only to replace him with a younger, more inexperienced worker.

24  _____

25      [5]  "The court need consider only the cited materials, but may consider other materials in
    the record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to
    support or dispute a fact cannot be presented in a form that would be admissible in evidence."

26  Fed. R. Civ. P. 56(c)(2).

1    Though plaintiff fails to specify the statute under which he brings his age

2    discrimination claim, the court will construe it as having been brought pursuant to California

3    Government Code § 12940(a), which is part of a larger statutory scheme commonly referred to

4    as the "California Fair Employment and Housing Act ("FEHA")."  See Reid v. Google, 50 Cal.

5    4th 512, 519 (2010) (describing "12900 et seq.").  Section 12940(a) of FEHA provides that it is

6    unlawful "[f]or an employer, because of ... age ... to refuse to hire or employ the person or to

7    refuse to select the person for a training program leading to employment, or to bar or to

8    discharge the person from employment or from a training program leading to employment, or to

9    discriminate against the person in compensation or in terms, conditions, or privileges of

10   employment ."

11   "When entertaining motions for summary judgment in employment

12   discrimination cases arising under state law, federal courts sitting in diversity must apply the

13   McDonnell Douglas[6] burden-shifting scheme as a federal procedural rule."  Zeinali v. Raytheon

14   Co., 636 F.3d 544, 552 (9th Cir. 2011); Reid v. Google, 50 Cal. 4th 512, 520 n.2 (2010) ("In

15   California, courts employ at trial the three-stage test that was established in McDonnell Douglas

16   [ ] to resolve discrimination claims, including age discrimination.").  This framework is as

17   follows:

18       First, the plaintiff has the burden of proving by the preponderance of the evidence a
         prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the
19       prima facie case, the burden shifts to defendant 'to articulate some legitimate,
         nondiscriminatory reasons for the employee's rejection.' [ ] Third, should the
20       defendant carry this burden, the plaintiff must then have an opportunity to prove by
         a preponderance of the evidence that the legitimate reasons offered by the defendant
21       were not its true reasons, but were a pretext for discrimination.

22   Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981) (citing McDonnell

23   Douglas Corp. v. Green, 411 U.S. 792, 802, 804 (1973)) (internal quotation omitted).  "The

24   ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

25

26       [6]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

1    against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253.  "'The

2    [employee] cannot simply show that the employer's decision was wrong or mistaken, since the

3    factual dispute at issue is whether discriminatory animus motivated the employer, not whether

4    the employer is wise, shrewd, prudent, or competent.... Rather, the [employee] must demonstrate

5    such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

6    employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

7    find them unworthy of credence ... and hence infer that the employer did not act for the

8    [asserted] non-discriminatory reasons.'"  Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 343

9    (2008) (quoting Hersant v. Dept. of Social Servs., 57 Cal. App. 4th 997, 1005 (1997)).  "To

10   survive summary judgment, plaintiffs must ... introduce evidence sufficient to raise a genuine

11   issue of material fact as to whether the reason the employer articulated is a pretext for

12   discrimination."  Roderiguez v. John Muir Med. Ctr., 2010 WL 3448567 (N.D. Cal. Aug.31,

13   2010).  "Employees may rely on both circumstantial and direct evidence ...."  Davis v. Team

14   Elec. Co., 520 F.3d 1080, 1091 (9th Cir. 2008).

15          1.    Brown has not stated a prima facie case

16          L-1 first seeks summary judgment on plaintiff's age discrimination claim on the

17   ground that plaintiff cannot state a prima facie case of discrimination because he cannot show

18   that he was satisfactorily performing his job prior to his termination.

19          To establish a prima facie case, plaintiff must show that (1) at the time of the

20   adverse action he was forty years of age or older; (2) he was satisfactorily performing his job; (3)

21   an adverse employment action was taken against him; and (4) some other circumstance

22   suggesting a discriminatory motive was present, such as his replacement by a significantly

23   younger worker with similar qualifications.  Guz v. Bechtel National, Inc., 24 Cal. 4th at 355

24   (2000).

25          In support of their motion, L-1 relies on the following undisputed facts to

26   establish that L-1 found Brown's performance to be unsatisfactory: (1) Pennetta and Hamel were

concerned with Brown's absences from the McClellan Plant even before the plant opened; (2) plaintiff was aware of a half dozen instances when people were looking for him and could not find him; (3) Pennetta repeatedly asked for daily status updates regarding the backlog of reprints and the deliveries to the DMV; (4) Pennetta had expressed to Brown his dissatisfaction with the latter's failure to provide regular daily status updates; (5) Brown admitted to sometimes providing the daily status updates late or not at all; (6) on at least two occasions, Pennetta directed Brown to increase his hours at the McClellan Plant after hearing from other employees that often they could not locate Brown; (7) Pennetta sent Brown an email on October 26, 2010 regarding the operation of the McClellan Plant and plaintiff's hours at the facility; (8) because of the backlog, the DMV complained about the management of the McClellan Plant and expressed disapproval of Brown; and (9) Brown was placed on a work improvement plan due to his failure to effectively manage the McClellan Plant.

Plaintiff counters that he was performing his job satisfactorily as evidenced by two positive performance evaluations. Those evaluations, however, were dated before the opening of the McClellan Plant, and it is undisputed that L-1's dissatisfaction with plaintiff's job performance stems from his performance while at the McClellan Plant and in response to the backlog of licenses and identification cards. Similarly unavailing is plaintiff's argument that he was performing satisfactorily as evidenced by the lack of a performance write-up or complaint before October 2010. This, again, is because L-1's dissatisfaction with plaintiff's job performance arose following the opening of the McClellan Plant in late-September 2010. Thus, the receipt of any positive evaluations or the lack of negative evaluations prior to the opening of the McClellan Plant is irrelevant to the analysis here.

Insofar as plaintiff asserts that L-1's dissatisfaction was misplaced because the real problems at the McClellan Plant were engineering, mechanical and/or software problems, the record establishes that Brown was not held responsible for software or engineering errors in the manufacturing process either in the PIP or at any other time. Rather, he was held

accountable for ensuring inspections were performed at the plant to catch defects before the delivery of the cards to the DMV, he was responsible for the communication of rejection rates and defect types to Pennetta, and he was expected to keep Pennetta informed of the status of deliveries.

To the extent plaintiff argues that he cannot be held responsible for the failure of his team to inspect the cards properly, this argument is belied by plaintiff's own understanding of his position as a production manager – namely, that he was ultimately responsible for the production process.

Finally, Brown relies on his travel to Colorado in November 2010 to receive the NASPO certification award to reflect his excellent job performance.  The undisputed facts, however, show that Brown did not lead the NASPO certification, Pennetta Supp. Decl. ¶ 7, that he was "required to work with the person who headed up that effort," Brown Dep. at 55:13-22, and that his travel to Colorado was pursuant to L-1's policy of inviting factory managers to accept the NASPO certifications for their facilities, Pennetta Supp. Decl. ¶ 8.  Accordingly, plaintiff's receipt of a NASPO certification award does not establish that he was performing his job duties to the satisfaction of Pennetta and Hamel.

On review of the record, then, the court concludes that Brown has failed to state a prima facie case because he has failed to show that he was performing his job satisfactorily.

2.     L-1 has articulated a legitimate, non-discriminatory reason for terminating plaintiff

Alternatively, L-1 argues that, if the court finds that plaintiff has made a prima facie case of discrimination, summary judgment should nonetheless be entered because L-1 has presented a legitimate, non-discriminatory reason for terminating plaintiff.  Plaintiff counters that L-1's reasons are merely a pretext to replace plaintiff with a younger, cheaper, and more inexperienced worker.

/////

1    If a plaintiff has established a prima facie case of discrimination, "[t]he employer

2    need only articulate, not prove a legitimate, non-discriminatory reason for deciding to terminate

3    the plaintiff." Holtzclaw v. Certainteed Corp., 795 F. Supp. 2d 996, 2011 WL 2295052 (E.D.

4    Cal. 2011); see Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002)

5    ("[C]ourts only require that an employer honestly believed its reasons for its actions, even if its

6    reason is foolish or trivial or even baseless." (internal quotations omitted)).

7    In order to prevail, plaintiff must present " 'specific and substantial' " evidence of

8    pretext. Morgan v. Regents of the Univ. of Cal., 88 Cal. App. 4th 52, 69 (2000) (quoting

9    Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) (internal quotation omitted));

10   see also Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1029 n.6 (9th Cir. 2006) ("A

11   plaintiff may not defeat a defendant's motion for summary judgment merely by denying the

12   credibility of the defendant's proffered reason for the challenged employment action."). As

13   explained below, plaintiff has not met his evidentiary burden and no " 'reasonable trier of fact

14   could conclude [L-1] engaged in intentional discrimination.'" Morgan, 88 Cal. App. 4th at 75

15   (quoting Horn v. Cushman & Wakefield W., Inc., 72 Cal. App. 4th 798, 806-07 (1999)).

16   FEHA does not "'require the employer to have good cause for its decisions. The

17   employer may fire an employee for a good reason, a bad reason, a reason based on erroneous

18   facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" Arteaga,

19   163 Cal. App. 4th at 344 (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187

20   (11th Cir. 1984)). Plaintiff has failed to show " 'that a discriminatory reason more likely

21   motivated the employer or ... that the employer's proffered explanation is unworthy of

22   credence.'" Hayden v. Potter, 2010 WL 3895066 (S.D. Cal. Sep. 30, 2010) (quoting E.E.O.C. v.

23   Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009)).

24   Here, L-1 asserts that plaintiff was fired because he failed to comply with the PIP,

25   the expectations of which were not new or a surprise to Brown. Brown was aware of

26   management's concerns with his absences at the McClellan Plant and with his failure to provide

20

1    timely daily status reports.  On October 26, 2010, Brown received an email from Pennetta

2    directing him to provide daily status reports and to be at the facility "excessively."   Less than

3    one month later, plaintiff was placed on a performance improvement plan.  In light of plaintiff's

4    failure to comply with the requirements of the PIP, the DMV dissatisfaction with L-1 increased,

5    it repeatedly contacted L-1 for status updates, resulting in embarrassment to L-1, and it

6    ultimately hired its own inspectors, leading to additional costs for L-1 and in the DMV's

7    decision to not pay on the DMV Contract until the backlog was cleared.  For these reasons,

8    Pennetta and Hamel determined that Brown should be terminated as the factory manager.

9          In his opposition, plaintiff argues again that the backlog was caused by faulty

10   machinery and engineering problems and that Pennetta was a "micro-manage[r]" with "unreal

11   expectations" who was "obsessive[]" with receipt of the status reports.  Plaintiff, however, has

12   failed to show that L-1's proffered reasons are "'internally inconsistent or otherwise not

13   believable.'"  Hayden, 2010 WL 3895066 (quoting Chuang v. Univ. of Cal. Davis, Bd. of Trs.,

14   225 F.3d 1115, 1127 (9th Cir. 2000)).

15         Additionally, plaintiff has submitted no evidence of discriminatory animus.  In his

16   deposition, plaintiff testified that he could not remember a single remark by any individual at L-1

17   that would suggest that there existed age-based animus.  See Brown Dep. at 244:14–245:8.

18   While plaintiff does rely on Pennetta's statement that the reason Brown was terminated was

19   because he was unable to adapt to the new procedures being utilized at the McClellan Plant, the

20   court finds nothing in this statement that would lead to a reasonable inference of discrimination

21   so as to create a triable issue of material fact that would defeat summary judgment.  Pottenger v.

22   Potlatch Corp., 329 F.3d 740, 747 (9th Cir. 2003).

23         Furthermore, plaintiff's reliance on the mere fact that he was replaced by a

24   younger employee does not undermine L-1's reason for terminating plaintiff or show pretext.

25   Instead, the record reflects that Arthur was chosen to replace plaintiff based on his consistently

26   positive performance at the McClellan Plant, which was noticed both by Pennetta and the DMV.

1   Prior to Brown's termination, Pennetta was already relying on Arthur when he was unable to

2   locate Brown or when Brown failed to provide necessary reports and updates to Pennetta.  Then,

3   following Brown's termination, Pennetta was impressed with Arthur's job performance while he

4   was temporarily managing the McClellan Plant, and both L-1 and the DMV were pleased that

5   the backlog was cleared in April 2011 under Arthur's leadership.  Next, while plaintiff is correct

6   to note that Arthur was younger and more inexperienced than Brown, any suggestion of age-

7   based discrimination is belied by the fact that Arthur was hired nearly six months after Brown's

8   termination and after L-1 interviewed six other individuals.  Finally, the court notes that Arthur's

9   experience-level was very similar to Brown's before his own hire, which consisted of only two

10  years of management experience gained over twenty years prior to his employ with Digimarc.  In

11  sum, while Arthur was indeed younger and more inexperienced than Brown, these facts, without

12  more, do not establish a triable issue of material fact.

13          Plaintiff's remaining arguments also fail.  Plaintiff first argues that L-1 had a

14  practice of replacing older, more expensive employees with younger, cheaper employees.  To

15  establish the existence of this practice, plaintiff submits the declaration of Dean Warner, L-1's

16  former Vice President of Manufacturing and Supply Chain.  In February 2010, Leo Sullivan, L-

17  1's President, fired Warner, despite positive performance evaluations, in order to cut operating

18  expenses.  Warner Decl. ¶ 5.  Warner's team was then divided between other managers, and

19  Pennetta, who was younger and paid less than Warner, was assigned to manage the

20  manufacturing team and portions of the engineering team.  Id. ¶ 8.  While high salary can

21  sometimes serve as a proxy for age, see U.S. E.E.O.C. v. Newport Mesa Unified School Dist.,

22  893 F. Supp. 927 (C.D. Cal. 1995), Warner's declaration does not establish, or even support,

23  plaintiff's claim that L-1 had a practice of discriminating against older employees.  This is

24  because the circumstances of and the events following the terminations of Warner and Brown are

25  materially different.  The stated reason for Warner's termination was directly related to his salary

26  (that is, L-1 wanted to cut operating expenses), Warner's team was then divided amongst other

22

managers, and Pennetta was one of the several managers who was assigned to manage a portion of Warner's original team.  Brown, on the other hand, was terminated for his failure to comply with the PIP and, six months later, was replaced entirely by Arthur.  Additionally, any argument that Brown was terminated because he was purportedly among the oldest and highest paid factory managers at L-1, "if not actually the oldest and highest paid," see Warner Decl. ¶¶ 10, 17, is mere speculation, and in order to survive a motion for summary judgment, plaintiff must do more than speculate.  Regardless, L-1 has submitted evidence that Brown was not, in fact, the oldest or highest paid factory manager.  Pennetta Supp. Decl. ¶¶ 3-4.

Brown next argues that there existed a conspiracy to get rid of him, and L-1 was using any reason to justify his termination.  In support, Brown claims that some time before December 3, 2010, an employee named "Mimi" asked him who was going to be his replacement. Brown construes this as evidence that L-1 was discussing his termination long before actually firing him.  But the record already establishes that Brown's termination was discussed as early as November 2010.  See Hamel Decl. ¶ 15.  That this was true does not establish discriminatory intent.  Brown also submits the declaration of Ben Buker, a former employee at the McClellan Plant, who declares that, prior to Brown's termination, Arthur was making promises of promotions once he became the manager in exchange for cooperation in spreading rumors and fabricating misinformation about Brown.  Even assuming these claims to be true, and notwithstanding L-1's evidentiary objections to Buker's declaration, these claims do not support an inference of age discrimination.  The simple fact is that plaintiff fails to rebut L-1's reasons for firing him.

Finally, Brown argues that he was a scapegoat for the production problems at the McClellan Plant and that his firing was intended to appease the DMV.  Even if true, a discharge is not "on the ground of age" within the meaning of the FEHA unless age is a motivating factor in the decision.  Brown's argument that he was a scapegoat establishes only that L-1's motivating factor was to appease the DMV, not "on the ground of [Brown's] age."

1    In sum, the court finds no evidence of age-based discrimination, and plaintiff has

2    failed to meet his burden of showing the existence of a genuine dispute of material fact.  L-1's

3    motion for summary judgment will be granted as to plaintiff's age discrimination claim.

4    B.    Plaintiff is not entitled to overtime pay

5    L-1 also seeks summary judgment on plaintiff's claim that he is entitled to

6    overtime based on L-1's policy and practice and further based on a promise made to him.  He

7    does not allege entitlement to overtime under state or federal law.  During his deposition,

8    plaintiff claimed entitlement to "comp time" to make up for those extra hours he worked at the

9    McClellan Plant.  See Brown Dep. at 255:20–256:3.

10    Brown argues that, while working under Warner, exempt employees who worked

11    long hours on start-ups and major projects were allowed to take "compensation time" off.  At the

12    time that plaintiff was working the long hours, though, he was not supervised by Warner.

13    Rather, he was supervised by Pennetta, who declares that L-1 does not have an unwritten

14    practice or procedure in which exempt, salaried managers accrue additional personal time off or

15    vacation in exchange for working more than 40 hours in a workweek.  Pennetta Decl. ¶¶ 48, 50.

16    He also declares that L-1 does not have a written policy that provides exempt employees

17    overtime pay or accrued extra paid time off when they work long hours.  Id.; Brown Dep. at

18    258:9-14.  Plaintiff does not address this in his opposition.

19    Insofar as plaintiff's claim sounds in contract law, plaintiff must show that there

20    existed either an express or implied contract.  See Cal. Civ. Code §§ 1620, 1621.  To establish an

21    express contract, Brown must present evidence of a promise for compensation stated in words.

22    In his deposition, Brown admitted that he was never promised anything specifically regarding

23    overtime compensation.  Brown Dep. at 256:25–257:2; 257:12-15.  See also Pennetta Decl. ¶¶

24    47, 49.  To establish an implied contract, Brown must show the existence and terms of a contract

25    which are manifested in conduct.  L-1 has submitted Pennetta's declaration, in which he states

26    /////

24

1  that Brown never asked him about overtime compensation and Pennetta never promised to pay

2  overtime.  See Pennetta Decl. ¶ 49.

3          In fact, the only basis for plaintiff's claim to entitlement consists of statements

4  made by out-of-town engineers who were brought into the McClellan Plant to assist with its

5  opening.  These engineers worked in a different department at L-1 and under a different manager

6  than Brown.  See Pennetta Decl. ¶ 11; Brown Dep. at 257:3-11.  They did not supervise Brown

7  or have any authority over him.  Brown Dep. at 257:3-11.

8          In light of the above evidence submitted by L-1, and Brown's failure to submit

9  any rebuttal evidence that would establish the existence of a genuine dispute of material fact, the

10  court will enter summary judgment on this claim for L-1.

11          Based on the foregoing, IT IS HEREBY ORDERED that:

12          1.  L-1's motion for summary judgment is granted;

13          2.  All dates set in this matter, including the December 5, 2012 bench trial, are

14  vacated; and

15          3.  Judgment be entered in favor of defendants.

16  DATED: November 8, 2012.

18  _____

   UNITED STATES MAGISTRATE JUDGE

20  /014;brow2848.msj